| | United States District Court, Northern District of Illinois | | |
|---|---|---|---|
| Name of Assigned Judge or Magistrate Judge | Harry D. Leinenweber | Sitting Judge if Other than Assigned Judge | |
| CASE NUMBER | 01 C 9077 | DATE | 10/1/2003 |
| CASE TITLE | Patricia A. Hampton vs. John E. Potter, et al | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to] ☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] ENTER MEMORANDUM OPINION AND ORDER: Potter's Motion for Summary Judgment is GRANTED as to Counts I, II, and III. Hampton's action is dismissed in its entirety.

(11) ■ [For further detail see order attached to the original minute order.]

Docketing to mail notices. ✓
Mail AO 450 form. ✓

courtroom deputy's initials: WAP

date docketed: OCT 0 3 2003

Document Number: 29

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| PATRICIA A. HAMPTON, <br><br> Plaintiff, <br><br> v. <br><br> JOHN E. POTTER, POSTMASTER GENERAL, UNITED STATES POSTAL SERVICE, <br><br> Defendant. | Case No. 01 C 9077 <br><br> Hon. Harry D. Leinenweber <br><br> **DOCKETED** <br> OCT 03 2003 |

## MEMORANDUM OPINION AND ORDER

Plaintiff Patricia A. Hampton ("Hampton") filed a three-count amended complaint against John E. Potter ("Potter") in his official capacity as Postmaster General of the United States of America, asserting claims of sexual harassment, retaliation, and hostile work environment. Potter now moves for summary judgment on all counts. For the following reasons, the Court grants the motion.

### I. BACKGROUND

In 1979, the United States Postal Service (the "USPS") hired Hampton as a window clerk in its O'Hare International Airport Terminal Two facility. Hampton remained in that facility until she resigned on November 19, 2002. Over the course of her employment, Hampton appears to have faced an unusual number of disciplinary actions. For example, in April 1994 she allegedly used abusive language toward, and threatened, another postal employee. Hampton disputes that she threatened the employee, but the USPS suspended



her from work for fourteen days for unacceptable conduct. In a routine audit conducted in July 1995, a USPS supervisor compared Hampton's stamps, cash, and money orders with the amount of stamps issued to her. While the tolerated discrepancy is $40.00, Hampton's drawer had a shortage of $295.00.

Many of Hampton's disciplinary problems occurred after the Spring of 1996, when Carl Johnson ("Johnson") became her immediate supervisor. Johnson was stationed at a separate facility but visited the Terminal Two location at least once a week for approximately an hour. Not long after taking the supervisory position in September 1996, Johnson issued Hampton a warning letter regarding her attendance. In that letter, Johnson cited twenty instances between March 19 and September 17, 1996 where Hampton was tardy or called in sick. In December 1996 Johnson again issued a warning letter to Hampton citing five unscheduled absences between November 12 and December 26, 1996. A few months later, Johnson issued a third letter to Hampton, dated February 18, 1997, that noted yet another unscheduled absence on February 6, 1997. Finally, in July 1997 Hampton was suspended for seven days for failure to maintain a regular attendance record. The suspension notice lists ten unscheduled absences between April 16 and July 16, 1997. While Hampton was again suspended for fourteen days for attendance infractions in November 1997, Johnson rescinded the suspension during the grievance process because the suspension

notice incorrectly identified two of Hampton's days off as unexcused absences.

Throughout this period, Hampton complained repeatedly about Johnson's treatment of her. On January 27, 1997, she went to the USPS's Equal Employment Opportunity Office (the "EEO Office") and complained that Johnson had been sexually harassing her. In an Information for Precomplaint Counseling Form dated February 24, 1997, Hampton alleged that Johnson had told her that her bust was nice and that he "would like to touch them." She also stated that on November 7, 1996, Johnson had brought a book about oral sex to work and asked if Hampton and another employee would read it. Hampton further complained about the letter of warning that Johnson issued in December 1996 regarding her unexcused absences.

On April 8, 1997, Hampton again complained to the EEO Office and alleged that she had been discriminated against on the basis of race and retaliation. The complaint stemmed in part from a March 14, 1997 audit of Hampton's drawer in which Johnson turned up a shortage of $248.11. The audit summary, which is signed by Johnson and witnessed by Sherie Harris, Hampton's co-worker, indicates that Hampton refused to sign the audit and refused a recount. In her April 8, 1997 EEO Complaint, however, Hampton alleged that she had requested a second count in the audit, but that Johnson had refused to conduct one. Hampton complained that Johnson had also retaliated against her for complaining about

sexual harassment by issuing the February 18, 1997 letter of warning for an unscheduled absence. She further claimed that Johnson had changed her work schedule and that he refused to pay her overtime for the hours that she worked outside of her original schedule.

In May 1998 Natasha Washington ("Washington"), who supervised Hampton in 1998 while Johnson was assigned elsewhere, initiated discharge proceedings against Hampton. Potter claims that the discharge proceedings resulted from Hampton's rude and threatening behavior to two customers on April 17, 1998. While Hampton was cautioned that she had engaged in unacceptable conduct, she was eventually suspended for fourteen days and not discharged. This suspension led to Hampton's third complaint with the EEO Office, which she filed on June 22, 1998. In that complaint, Hampton alleged that Washington's actions were in retaliation for Hampton's initial complaint against Johnson.

On August 31, 2001, Hampton's attorney received a Right to Sue Notice on Hampton's complaints from the Equal Employment Opportunity Commission (the "EEOC"). On November 26, 2001, Hampton timely filed a complaint in this Court asserting claims of sexual harassment and retaliation. A year later, on November 19, 2002, Hampton resigned from the USPS. She subsequently filed an amended complaint on February 14, 2003, adding a claim for sexual harassment based on a hostile working environment.

In Count One of her amended complaint, the sexual harassment count, Hampton alleges that Johnson made lewd gestures toward her with his tongue, that he brought a book about oral sex to work, and that he repeatedly tried to touch Hampton's breast. She also contends that Johnson intimated that she would receive preferential treatment if she submitted to his advances and that when she refused those advances, Johnson issued false disciplinary actions against her and refused to pay her for overtime that she had worked. In Count Two, the retaliation count, Hampton alleges that Johnson retaliated against her for filing complaints with the EEO Office by preventing her from working overtime, by refusing to re-audit her drawer, by suspending her, and by attempting to remove her from her job. Finally, in Count Three Hampton asserts a hostile environment claim and contends that Johnson constructively discharged her on November 19, 2002. She alleges that the constructive discharge resulted in part from a November 14, 2002 incident in which Johnson told a customer who complained of a bad back that she should put her legs up high when she got home. After the customer left, Hampton alleges that Johnson said that the customer should spread her legs wide open. Hampton further contends that Johnson created a sexually hostile environment through "hostile comments and actions" that made it impossible for her to continue her employment.

Since filing her complaint, Hampton has made additional allegations about Johnson's behavior both in her deposition and in an affidavit that accompanied her Response to Defendant's Motion for Summary Judgment (the "Response Brief"). Hampton did not include these incidents in the complaints she filed with the EEO Office.

## II. **DISCUSSION**

### A. **Summary Judgment**

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). A fact is "material" if it could affect the outcome of the suit under the governing law; a dispute is "genuine" where the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The burden is initially upon the movant to demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In assessing the movant's claim, the Court must view all the evidence and any reasonable inferences that may be drawn from that evidence in the light most favorable to the nonmovant. *Miller v. Am. Family Mut. Ins. Co.*, 203 F.3d 997, 1003 (7th Cir. 2000). Once the moving party has met

its burden, the nonmoving party "may not rest upon the mere allegations" contained in its pleading, but rather "must set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e); *Becker v. Tenenbaum-Hill Assoc., Inc.*, 914 F.2d 107, 110 (7th Cir. 1990); *Schroeder v. Lufthansa German Airlines*, 875 F.2d 613, 620 (7th Cir. 1989).

### B. Count I - Sexual Harassment

Title VII forbids any workplace discrimination with respect to "compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). In her complaint, Hampton alleges that she was subjected to sexual harassment (Count One) and hostile work environment harassment (Count Three). Both parties treat Hampton's claim in Count Three as a constructive discharge claim, however, and therefore the Court will also treat it as such. Regardless, the Supreme Court has abandoned the distinction between *quid pro quo* harassment and hostile environment harassment for vicarious liability purposes. *See Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 760-65 (1998); *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998). Even if Hampton had brought a hostile work environment claim, the Court would have addressed it with her claim of sexual harassment.

In *Ellerth* and *Faragher*, the Supreme Court established the standards that govern an employer's liability for sexually

harassing behavior of a supervisor toward a subordinate employee. *Molnar v. Booth*, 229 F.3d 593, 599 (7th Cir. 2000). The Court created a distinction between "cases in which the supervisor takes a tangible employment action against the subordinate and those in which he does not." *Id.* at 600. The Court explained that an employer was vicariously liable "to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee" where "the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment." *Faragher*, 524 U.S. at 807-08; *Ellerth*, 524 U.S. at 765. In cases where the supervisor took no tangible employment action, however, the Supreme Court permitted the defending employer to raise an affirmative defense to liability or damages. *Faragher*, 524 U.S. at 807; *Ellerth*, 524 U.S. at 765.

As a result of *Faragher* and *Ellerth*, therefore, Hampton must demonstrate that Johnson created an actionable hostile environment *and* took tangible employment actions against her in order to establish that Potter, in his official capacity, is vicariously liable for Johnson's actions. If she is successful, the inquiry is at an end. If Hampton establishes that she endured an actionable hostile environment but fails to establish that Johnson took any tangible employment actions against her, Potter could raise an affirmative defense to liability.

Potter argues that Hampton was not subjected to an actionable hostile environment and that even if she was, no reasonable jury could conclude that the harassment led to any tangible employment action. Because the Court does not believe that Hampton faced an actionable hostile environment, it need not reach the issue of whether the harassment led to a tangible employment action.

### 1. Hostile Work Environment

Hampton's complaint alleges four incidents of harassment: 1) Johnson's lewd tongue gestures; 2) his bringing a book about oral sex to work; 3) his repeated attempts at touching Hampton's breast; and 4) his intimation that Hampton would receive preferential treatment if she allowed him to touch her breasts. In her Response Brief, however, Hampton supplements these acts with the following alleged incidents: 1) in September 1996 Johnson tapped her on the shoulder and kissed her by surprise; 2) in 1996 or 1997 Johnson blew into the telephone after Hampton answered it; 3) on four occasions in 1998 Johnson made comments about wanting to suck on her breasts; 4) in 2001 Johnson came up to her work cubicle and made a sexually explicit comment; and 5) Johnson grabbed her buttocks at least three times in 2001 and 2002.

#### a. The Additional Claims

Potter asks the Court to disregard most of Hampton's additional allegations. First, he asserts that her claims that Johnson stated that he wanted to suck her breasts and that he

grabbed her buttocks, both of which appear only in the affidavit that accompanied her Response Brief, are contradicted by Hampton's deposition testimony, by her responses to interrogatories, and by the affidavits she submitted to the EEO Office. Indeed, in his First Set of Interrogatories, Potter asked Hampton to identify "each and every act, omission, event, incident, course of action, policy or procedure" which she believed "constituted sexual harassment or retaliation in this case." Hampton did not list either of these claims in her response. She also made no mention of either claim in the affidavits she submitted to the EEO Office in 1998 and 1999. Each time Hampton was deposed, she was asked to list every statement of a sexual nature that Johnson made and did not mention his alleged comments about sucking her breasts. She did testify that Johnson touched her arm once and that he had rubbed a mail tub across her buttocks but testified that those were the only times that he had actually touched her.

The Seventh Circuit has stated firmly that where affidavits are offered to contradict the affiant's deposition, they are "entitled to zero weight in summary judgment proceedings unless the affiant gives a plausible explanation for the discrepancy." *Beckel v. Wal-Mart Assocs., Inc.*, 301 F.3d 621, 623 (7th Cir. 2002). Hampton gives no such explanation. Neither does she provide any other evidence of these incidents. Gerald Kubick, the plant manager whom Hampton allegedly told about Johnson's comments,

testified that he remembered her "specifically talking about breasts," but had no recollection of what exactly Hampton told him. Kubick certainly did not mention the crude comments that Johnson allegedly made. Calvin Crawley, the supervisor of customer services, testified that Hampton told him that "Mr. Johnson had grabbed her behind." This statement, however, is inadmissible hearsay and may not be considered at the summary judgment stage. *Russell v. Acme-Evans Co.*, 51 F.3d 64, 68 (7th Cir. 1995). Accordingly, the Court will disregard the alleged comments about Hampton's breasts and the buttocks touching incidents in assessing her sexual harassment claim. Given that Hampton testified that Johnson touched her buttocks with a plastic tub in 2002, however, the Court will consider this incident.

Second, Potter argues that the Court should also disregard Hampton's claims that Johnson kissed her in September 1996 and that he made a sexually explicit comment to her in 2001. Potter contends that Hampton failed to exhaust her administrative remedies regarding those claims. Under 29 C.F.R. § 1614.105(a)(1), federal employees must notify an EEO counselor of any discriminatory incident within forty-five days of its occurrence in order to assert a Title VII claim based on that conduct at a later stage. 29 C.F.R. 1614.105(a)(1). Hampton first contacted the USPS's EEO Office on January 27, 1997, more than forty-five days after the alleged kiss. She did not even mention that Johnson had kissed her

in that complaint. Neither did Hampton complain to the EEO Office about the 2001 sexually explicit comment. Accordingly, these incidents are time-barred.

### b. Assessment of the Claim

The question then is whether the remaining incidents constitute an actionable hostile work environment. The remaining claims that Hampton alleges in her Response Brief are that: 1) at least every other week between 1997 and 2001, Johnson made lewd tongue gestures at her; 2) in November 1996 Johnson brought a book about oral sex to work; 3) in December 1996 Johnson asked Hampton if he could touch her breasts and intimated that she would receive preferential treatment if she submitted to his advances; 4) at some time in 1996 or 1997, Johnson blew into the telephone after Hampton answered it; and 5) Johnson touched Hampton's buttocks with a plastic tub in 2002.

To establish that Johnson created an actionable hostile work environment, Hampton must show that she endured "harassment so severe or pervasive that it altered the conditions of her employment." *Patt v. Family Health Sys., Inc.*, 280 F.3d 749, 754 (7th Cir. 2002). The Court looks at a variety of factors in assessing Hampton's work environment, including the frequency and severity of the harassing conduct, whether the conduct was physically threatening or humiliating or merely an offensive utterance, and whether the conduct unreasonably interfered with her

work performance. *Id.* The Court may accept some teasing or isolated offensive incidents, however, it will not tolerate sexually hostile environments that are "both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Faragher*, 524 U.S. at 787.

It is clear that Hampton subjectively considered her work environment to be hostile. What is less clear is whether an objective person would agree. If true, Johnson's actions are reminiscent of those taken by the most emotionally stunted adolescents. The fact that an adult would behave this way is pitiful. Given the infrequency of most of the incidents and the fact that they occurred over a six-year time span, however, it is unlikely that an objective person would consider Hampton's work environment to be hostile. Johnson's repeated tongue gestures were no doubt highly irritating, but they were brief and were not sufficiently obscene or intimidating to create an abusive environment. Hampton did not read or even look at the book that Johnson brought to work and indeed, it appears that Johnson brought the book for another co-worker. Although Johnson asked to touch Hampton's breast, he did not touch her and there is no evidence that his request was threatening in any way. Hampton was by the door during the entire incident, and was only in the office for two seconds. Hampton adduces no evidence that Johnson suggested that

she would receive preferential treatment if she complied with his request. It is impossible to tell from Hampton's Response Brief how many times Johnson breathed into Hampton's phone as the brief suggests both that it happened once and that it happened multiple times. Even if it occurred several times, however, there is no indication that the action was threatening or intimidating. Johnson's brushing of a mail tub against Hampton's buttocks is wholly inappropriate for the workplace. However, while the Seventh Circuit has explained that "direct contact with an intimate body part constitutes one of the most severe forms of sexual harassment," *Worth v. Tyer*, 276 F.3d 249, 268 (7th Cir. 2001), it has also held that an unwanted poke at an employee's buttocks was not a severe incident. *Adusumilli v. City of Chicago*, 164 F.3d 353, 362 (7th Cir. 1998). The contact here was neither direct nor overtly sexual.

Even taken together, these incidents did not create an actionable hostile environment. Accordingly, the Court need not address whether the harassment led to a tangible employment action. Potter's motion for summary judgment on Count One is granted.

### C. Count II - Retaliation

Title VII bars employers from retaliating against employees who complain about certain forms of discrimination. 42 U.S.C. § 2000e-3(a). In her complaint, Hampton alleges that she was retaliated against for reporting sexual harassment by Johnson to

the EEO Office. The alleged incidents of retaliation include: 1) the issuance of a false letter of warning; 2) Johnson's refusal to permit Hampton to work overtime; 3) Johnson's refusal to re-audit her drawer; 4) her suspension; and 5) Johnson's attempt to remove her from service. In the four sentences that she devotes to this claim in her Response Brief, Hampton mentions only Johnson's purported attempts to suspend her and adds a new allegation that Johnson failed to record her time correctly.

To demonstrate that Potter violated Title VII's provision against retaliation, Hampton may present direct or indirect evidence of retaliatory intent. *Hilt-Dyson v. City of Chicago*, 282 F.3d 456, 465 (7th Cir. 2002). Where, as here, there is no direct evidence of retaliation, a plaintiff must proceed under the indirect method of proof. The indirect methodology requires Hampton to present evidence sufficient to establish a *prima facie* case of retaliation. *Id.* In order to do so, she must establish that she: 1) engaged in statutorily protected activity, 2) performed her job according to the USPS's legitimate expectations, 3) suffered a materially adverse employment action despite meeting those legitimate expectations, and 4) was treated less favorably than similarly situated employees who did not engage in statutorily protected activity. *Id.* Failure to satisfy any element of the *prima facie* case proves fatal to Hampton's retaliation claim. *Id.* If Hampton does prove a *prima facie* case,

however, the burden shifts to Potter to offer a legitimate, noninvidious reason for the adverse employment action. *Id.* If he is successful, Hampton must demonstrate that the proffered reason is a pretext or lie. *Id.*

There is nothing in the record to support Hampton's retaliation claim under the indirect method. Several of the alleged retaliatory incidents are not adverse employment actions and therefore cannot survive as claims. For example, a letter of reprimand does not constitute an adverse employment action "unless the letter is accompanied by some other action, such as job loss or demotion." *Krause v. City of La Crosse*, 246 F.3d 995, 1000 (7th Cir. 2001). Neither the December 1996 nor the February 18, 1997 letters of warning were accompanied by any additional punitive actions. Similarly, even if Johnson failed to perform a re-audit, an allegation that is belied by the statement on the audit summary that Hampton refused a recount, his failure does not constitute an adverse employment action.

While the suspension that Hampton received in July 1997 did constitute an adverse employment action, she was clearly not performing her job satisfactorily when she was suspended. Hampton had received three written warnings for her poor attendance prior to her suspension. The suspension notice itself indicates that she had ten additional unscheduled absences between April 16 and July 16, 1997. Moreover, Hampton adduces no evidence that the

USPS's proffered reason for the suspensions, namely her poor attendance record, was pretextual. Hampton also produces no evidence that she was denied overtime or that Johnson tried to discharge her. Indeed, the only discharge proceedings brought against Hampton were initiated by Washington while Johnson was stationed elsewhere. There is no evidence that Washington knew that Hampton had complained of harassment. Finally, Hampton's claim that Johnson failed to record her time correctly is unsupported by the record. Calvin Crawley testified that Johnson had twice failed to record the correct time for Hampton, but had also failed to record the correct time for several other employees at the Terminal Two facility. Crawley testified that there was no indication that Johnson had singled Hampton out in his misreporting. Mary Robinson, a time and attendance technician at the USPS, provided an affidavit stating that in three instances Hampton's reported time did not add up to eight hours. This statement, however, does not prove that Johnson misreported Hampton's time. Potter's motion for summary judgment on this Count is granted.

### D. Count III - Constructive Discharge

Hampton spends even less time on her constructive discharge claim than she does on her retaliation claim. Indeed, she merely asserts that she has "strong evidence" that she was constructively discharged because she endured the harassment for six years and

decided that she could no longer handle it. To establish a claim for constructive discharge under Title VII, Hampton must prove that her working conditions were "so intolerable as a result of unlawful discrimination that a reasonable person would be forced into involuntary resignation." *Tutman v. WBBM-TV, Inc./CBS, Inc.*, 209 F.3d 1044, 1050 (7th Cir. 2000). The conditions for constructive discharge must be "even more egregious than the high standard for hostile work environment." *Id.* Given that Hampton has failed to establish that she endured a hostile work environment, she cannot demonstrate that her working conditions were so intolerable that she had to quit her job. While Hampton suggests in her Response Brief that the November 14, 2002 incident (in which Johnson allegedly told a customer to put her legs up when she got home) led her to resign, that incident, even taken together with Johnson's prior actions, is not egregious enough to establish constructive discharge. Accordingly, the Court grants Potter's motion for summary judgment on this Count.

## CONCLUSION

For the reasons set forth above, Potter's Motion for Summary Judgment is **GRANTED** as to Counts I, II, and III. Hampton's action is **dismissed in its entirety**.

**IT IS SO ORDERED.**

Date: October 1, 2003

Harry D. Leinenweber, Judge
United States District Court